# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

ANDREA M. LESTER,

                           Plaintiff,

       v.                                   3:13-CV-531
                                           (FJS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                           Defendant.

---

HOWARD D. OLINSKY, ESQ., for Plaintiff
ANDREEA L. LECHLEITNER, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Frederick J. Scullin, Jr., Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.     PROCEDURAL HISTORY

On May 2, 2011, plaintiff "protectively filed"[1] applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits, alleging disability beginning March 28, 2011. (Administrative Transcript ("T.") 26, 76, 83, 140-51, 197, 201). The applications were initially denied on June

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

27, 2011. (T. 86, 92). Administrative Law Judge ("ALJ") Robert Wright conducted a hearing on May 18, 2012, at which the plaintiff and a vocational expert ("VE") testified. (T. 41-68). On June 15, 2012, the ALJ issued a decision denying plaintiff's applications for benefits. (T. 26-34). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on March 15, 2013. (T. 1-6).

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which

2

significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417 (quoting *Talavera v. Astrue*, 697 F.3d at 151; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than

the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III. <u>FACTS</u>

As of the date of the administrative hearing in May 2012, plaintiff was 31 years old. (T. 45, 140). She reported earning her GED (T. 45, 201), and had past work experience as a cashier, deli associate, deli clerk, and laborer (T. 48, 202). Plaintiff claimed disability based on continuing back pain, following lumbar spine surgery in April 2011, and fibromyalgia, which was first diagnosed in early 2012. (T. 44-45, 419-20, 433, 441-43, 457-60, 462-63, 465, 467-69, 471-74, 506-08).

Plaintiff's brief (at 2-15, Dkt. No. 12) provides a detailed statement of the

medical and other evidence of record, which the defendant's brief (at 1-2, Dkt. No. 14), adopts, "with the exception of any inferences or conclusions . . . ." Rather than detailing the evidence in this case at the outset, the court will discuss the relevant facts below, as necessary to address the issues raised by plaintiff.

## IV.  ALJ's DECISION

The ALJ determined that plaintiff met the insured status requirement for purposes of her DIB application through March 31, 2013, and had not engaged in substantial gainful activity since March 28, 2011–the alleged onset date. (T. 28). The ALJ found plaintiff suffered from the severe impairments of lumbar spondylosis, status post L3-L4 fusion, and fibromyalgia. (T. 28). He found plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (T. 28).

The ALJ determined that plaintiff had the residual functional capacity ("RFC") to "perform sedentary work . . . except the [plaintiff] cannot lift over twenty pounds and requires the ability to change position every thirty minutes." (T. 29-32). In reaching his RFC findings, the ALJ concluded that the plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were "not credible" to the extent they were inconsistent with the RFC determination. (T. 29, 32).

The ALJ found plaintiff was unable to perform any of her past relevant work. (T. 32). However, referencing the testimony of the VE, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform." (T. 32-34). The ALJ concluded that claimant "has not been under a disability . . . from March 28, 2011, through the date of this decision." (T. 34).

## V.    ISSUES IN CONTENTION

Plaintiff advances the following arguments:

(1)    The ALJ's residual functional capacity determination is unsupported by substantial evidence because the ALJ erred in evaluating Dr. Fang's opinion surrounding plaintiff's sitting limitations and failed to reconcile significant portions of Dr. Fang's opinion with the residual functional capacity determination.  (Pl.'s Br. at 1, 17-21).

(2)    The ALJ's credibility determination is not supported by substantial evidence because the ALJ erred in analyzing the required factors when assessing plaintiff's credibility.  (Pl.'s Br. at 1, 21-22).

(3)    The ALJ's step-five determination is not supported by substantial evidence because the ALJ relied upon an incomplete hypothetical question asked to the vocational expert.  (Pl.'s Br. at 1, 22-24).

This court agrees with the plaintiff that the ALJ erred in his analysis at steps four and five, and did not marshal substantial evidence to support his credibility and RFC determinations, which taints his ultimate finding that plaintiff was not disabled. Accordingly, the court recommends that this case should be remanded for further administrative proceedings to properly determine plaintiff's RFC.

## VI.    RFC/CREDIBILITY

### A.    Legal Standards

#### 1.    RFC

Residual functional capacity ("RFC") is "what [the] individual can still do despite his or her limitations.  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."   A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No.

6

3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL

374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical

facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's

subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R.

§§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y.

1999).  An ALJ must specify the functions plaintiff is capable of performing, and may

not simply make conclusory statements regarding a plaintiff's capacities.  *Id.* (citing,

*inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)).  RFC can only be

established when there is substantial evidence of each physical requirement listed in

the regulations.  *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y.

1990)).  The RFC assessment must also include a narrative discussion, describing how

the evidence supports the ALJ's conclusions, citing specific medical facts, and non-

medical evidence.  *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at

*6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

As noted, the ALJ found that plaintiff had the RFC to perform sedentary work,

with the additional restrictions that the plaintiff cannot lift over twenty pounds and

requires the ability to change position every thirty minutes.  The full range of

sedentary work involves lifting no more than ten pounds at a time and occasionally

lifting or carrying articles like docket files, ledgers, and small tools.  20 C.F.R. §§

404.1567(a), 416.967(a); SSR 96-9p, 1996 WL 374185, at *3.  Jobs are sedentary if

walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about two hours of an eight-hour workday. Sitting would generally total about six hours of an eight-hour workday. SSR 96-9p, 1996 WL 374185, at *3.

### 2. Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must properly analyze the reasons that the report is rejected. *Halloran v. Barnhart*, 362 F.3d at 32-33. An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3. Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (citation omitted). To satisfy the

substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. §§ 404.1529(c), 416.929(c).  When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### B.     Evaluation of Medical Evidence

#### 1.     Summary of Relevant Evidence

After about a year of unsuccessful, conservative treatment of progressively debilitating back pain, plaintiff was referred to neurosurgeon Khalid Sethi, M.D. in April 2011, due to concern that she was suffering from cauda equina compression as a result of spondylolisthesis (or forward slippage) and disc herniation in her lumbar spine.  (Pl.'s Br. at 2-6; T. 416).[2]  On April 4, 2011, Dr. Sethi performed spinal surgery on plaintiff, in particular:  Gill laminectomy L3-4, bilateral lateral recess decompression, interbody fusion L3 and posterior spinal fusion L3-4 with autologous iliac crest harvest.  (T. 416, 419-20).  Dr. Sethi noted improvement in plaintiff's condition during post-operative visits on April 15 and May 17, 2011.  (T. 413-14).  On June 16, 2011, Dr. Sethi wrote to the New York State Office of Temporary Disability Assistance stating that, although plaintiff was doing well six weeks after her surgery, she continued to have some mild low-back pain.  Dr. Sethi indicated that plaintiff should not lift more than 30 pounds, push or pull more than 40 pounds, or sit for longer than 40 or 45 minutes, but noted "no further restrictions at this time."  (T. 433).

Dr. Sethi referred plaintiff to Xiao Fang, M.D., a pain management specialist (T. 441).  On June 27, 2011, plaintiff complained to Dr. Fang of persistent, significant lower back pain, especially after sitting or standing for more than 30 minutes.  (T.

---

[2]  " . . . [C]auda equina syndrome is a severe neurological disorder that can lead to incontinence and even permanent paraplegia if left untreated. . . .  Cauda equina syndrome most commonly results from a massive disc herniation in the lumbar region. . . .  The result is that the softer, center portion of the disc pushes out and causes pressure on the nerve roots in the lumbar spine.  Cauda equina syndrome is caused by this compression of the nerve roots." http://www.columbianeurosurgery.org/conditions/cauda-equina-syndrome/.

441).  Plaintiff reported that her pain radiated to her lower extremities, and described the pain as burning, deep, sharp, shooting, stabbing and throbbing.  Associated symptoms included tingling in the legs and weakness in the lower extremities.  (T. 441).  On examination, Dr. Fang found plaintiff ambulated with a slow gait, had tenderness in the lumbar paraspinals, and had limited range of motion of the lumbar spine.  (T. 442).  On neurological examination, Dr. Fang found plaintiff's sensation was decreased in the left lower leg, but found no focal weakness.  (T. 442).  Dr. Fang diagnosed plaintiff with low back pain status post-fusion.  (T. 443).

On that same date, Dr. Fang completed an RFC questionnaire, noting a "guarded" prognosis for plaintiff's diagnosis of lumbar spondylosis and related back pain.  (T. 436).  Dr. Fang opined that plaintiff's impairments and associated symptoms would "constantly" be severe enough to interfere with the attention and concentration required to perform simple work-related tasks.  (T 436).  Dr. Fang reported that plaintiff had the following functional limitations:  she could sit a total of 30 minutes at one time and four hours[3] total in an eight-hour workday; she could stand/walk a total of 30 minutes at one time and a total of one hour in an eight-hour workday; she would need a job permitting shifting positions at will from sitting, standing or walking; she would need unscheduled breaks every 30 minutes lasting five to ten minutes in an eight-hour workday; she would be absent from work more than four times per month as a result of her impairments or treatments; and she could occasionally lift ten pounds.  (T. 436-37).  Dr. Fang opined that plaintiff was not a malingerer, and that

---

[3] Apparently, Dr. Fang first circled three hours, but then crossed out that entry and circled four hours, in response to the questions of how long plaintiff could sit during the workday.

her physical limitations were reasonably consistent with the symptoms and functional limitations described in her evaluation. (T. 437).

During follow-up visits on August 18, September 12, and November 14, 2011, and February 27, 2012, Dr. Sethi and his staff evaluated plaintiff for worsening, severe, debilitating, radiating pain in her neck, shoulders, and back. (T. 457-60, 465).[4] Aggravating circumstances included bending, lying down, and prolonged sitting and standing. (T. 458). Associated symptoms included difficulty sleeping, muscle spasms, and numbness, tingling, and weakness of an arm or leg. (T. 457, 458). On examination in September 2011, plaintiff had several muscle spasms palpated in the cervical region. (T. 458). It was noted that an MRI of the cervical spine was normal except for mild central T2-3 disc protrusion. (T. 458). Dr. Sethi ultimately found no evidence of neural compressive pathology related to the spinal surgery that he performed, and concluded that he did not see "any role for any additional target surgical strategies," as of February 2012. (T. 465). He referred plaintiff to neurology and rheumatology for a work-up for fibromyalgia and other conditions, "particularly demyelinating conditions"[5] that would be consistent with her apparent neuropathic[6] or

---

[4] Defense counsel, in summarizing the series of reports of Dr. Sethi's staff focuses on more benign terms sometimes used to describe plaintiff's symptoms, including "mild" and "discomfort." (Def.'s Br. at 8-10).

[5] "A demyelinating disease is any condition that results in damage to the protective covering (myelin sheath) that surrounds nerve fibers in your brain and spinal cord." http://www.mayoclinic.org/demyelinating-disease/expert-answers/faq-20058521

[6] Neuropathic pain is a complex, chronic pain state that is often accompanied by injury to nerve fibers and can be associated with a multitude of causes, including spinal surgery. http://www.webmd.com/pain-management/guide/neuropathic-pain

hyperpathic pain.[7] (T. 457, 465). Dr. Sethi suggested "there may be a role for dorsal column stimulation for [plaintiff's] neuropathic pain syndrome." (T. 465).

On January 11 and February 8, 2012, Elizabeth S. Hull, FNP, of Regional Rheumatology Associates evaluated plaintiff for fibromyalgia type symptoms. (T. 471-74). Nurse Practitioner ("NP") Hull's report of the January examination noted that plaintiff experienced a burning sensation of her legs, arms, and over the dorsal aspect of her back down to her buttocks, as well as tingling from her buttocks down to her toes, with occasional numbness of the left leg. (T. 472). Plaintiff stated that her legs become stiff and often "jelloey," and that her legs "give out" on occasion. (T. 472). Plaintiff reported that various medications were ineffective or caused significant side effects: Lyrica caused her to vomit; she obtained no relief with Celebrex or Vimovo; Oxycodone did not help her much; and Flexeril caused her to become quite sleepy. (T. 472). Upon examination, Nurse Practitioner Hull found, *inter alia*, that plaintiff had "diffuse musculoskeletal pain in her upper extremities, including the wrists, elbows, and shoulders, as well as over the cervical, thoracic, and lumbar spine area." (T 474). Plaintiff exhibited tenderness over her lumbosacral (lower) spine, GTB (part of the hip), thighs, ankles, and shins. (T. 474). NP Hull diagnosed plaintiff with "most likely fibromyalgia syndrome with increased sensitivity since surgery in April," and prescribed neurontin. (T. 474).

On February 8, 2012, plaintiff reported that neurontin was helping somewhat,

---

[7] The International Association of the Study of Pain, in its Classification of Chronic Pain (1994), defines hyperpathia as " . . . a painful syndrome characterized by an abnormally painful reaction to a stimulus, as well as an increased threshold."
http://www.therapyofpain.com/hyperpathia.htm

but she that still had pain during the daytime. (T. 471). Upon examination, NP Hull found that plaintiff had musculoskeletal tenderness at the posterior base of the skull along the trapezius ridges; the paraspinal area of the cervical, thoracic and lumbar spine; the lateral hip area; upper thighs; and shins. (T. 471). The plaintiff exhibited a good range of motion and a steady gait, and her strength was intact. NP Hull diagnosed plaintiff with fibromyalgia syndrome, and increased her neurontin. (T. 471).

On May 14, 2012, NP Hull completed an RFC questionnaire outlining the limitations resulting from plaintiff's degenerative disc disease of the lumbar spine with radiculopathy, fibromyalgia, and cervical spondylosis. (T. 503). NP Hull opined that plaintiff's symptoms would frequently be severe enough to interfere with the attention and concentration required to perform simple work-related tasks. (T. 503). NP Hull reported that plaintiff had the following limitations: she could sit for 15 minutes at a time and up to one hour in an eight-hour workday; she could stand/walk for 15 minutes at one time and up to two hours in an eight-hour workday; she would need a job which permitted shifting positions at will from sitting, standing, or walking; she would need unscheduled breaks every 20 minutes lasting ten minutes in duration during the eight-hour workday; she would miss work more than four times per month as a result of treatments and impairments; and she could occasionally lift less than ten pounds. (T. 503-04). NP Hull opined that plaintiff was not a malingerer; that her impairments were reasonably consistent with the symptoms and functional limitations described; and that she was not capable of working an eight-hour day, five

days per week, on a sustained basis.  (T. 504).

On February 17, 2012, Dr. Fang treated plaintiff for persistent low back pain, which worsened after sitting and standing more than 20 to 30 minutes.  (T. 462). Plaintiff reported that her back pain radiated to her lower extremities and described the pain as burning, numbing, and sharp.  (T. 462).  Dr. Fang noted plaintiff was taking norco, flexeril, neurontin, all with side effects of fatigue.  (T. 462).  On examination, Dr. Fang found plaintiff ambulated with a slow gait; had decreased range of motion in her lumbar spine, especially with extension; and had tenderness in the lumbar paraspinals.  (T. 463).

On that same date, Dr. Fang completed a second RFC questionnaire, finding again that plaintiff had a guarded prognosis relating to her lumbar spondylosis and related back pain, weakness, and fatigue.  She opined that plaintiff's symptoms would frequently interfere with her attention and concentration required to perform simple work-related tasks.  (T. 486).  Dr. Fang reported that plaintiff had the following limitations, among others:  she could sit a total of 20 to 30 minutes at a time and four hours total in an eight-hour workday; she could stand 20 to 30 minutes at a time and a total of two hours in an eight-hour workday; she would need a job permitting shifting positions at will from sitting, standing, or walking; she would need unscheduled 5-minute breaks every hour during an eight-hour; she would miss work more than four times a month as a result of her impairments or treatments; and she could occasionally lift 20 pounds.  (T 486-87).  Dr. Fang opined that plaintiff was not a malingerer; that her impairments were reasonably consistent with the symptoms and functional

limitations described; but answered "yes" in response to the question as to whether plaintiff was capable of working an eight-hour day, five days per week, on a sustained basis. (T. 487).[8]

## 2. Analysis

The ALJ stated that he afforded "significant weight" to Dr. Fang's February 2012 opinion "except for the portion in which [she][9] opines that the [plaintiff] is limited to sitting for four hours total in an eight-hour workday, as it is inconsistent with the medical records." (T. 31). The ALJ noted:

> Dr. Fang is the claimant's treating pain management physician, and has treated her for a prolonged period and is familiar with claimant's restrictions, which makes his opinion significant. [She] is also a pain management specialist, which would give [her] knowledge about how the claimant's conditions affect her ability to complete work related activities.

(T. 31). However, the ALJ stated that he "believes that the claimant maintains the ability to complete prolonged sitting because of the medical records. The claimant does not have any additional diagnostic findings that would suggest that she is limited in her ability to sit." (T. 32).

---

[8] On September 10, 2012, between the time of the ALJ's decision and the ruling of the Appeals Counsel, Dr. Fang again treated plaintiff, who reported that, despite some prior relief, her pain was getting worse again. Plaintiff reported lower back pain which radiated to and caused numbness in her lower, right extremities. Plaintiff stated that her pain was so severe, she has difficulty walking and had been to the emergency room several times. (T. 506). On examination, Dr. Fang found that plaintiff had an antalgic gait; mild lumbar spasms; tenderness in her gluteals, lumbar region, and paraspinous muscles; moderate restrictions in flexion, extension, and lateral bending; and decreased sensation in her right medial knee and lower leg. (T. 507-08). She concluded that plaintiff might benefit from lumbar, epidural steroid injections. (T. 508). The medical records corroborate that plaintiff had an emergency room visit for back pain and numbness on March 14, 2012. (T. 467).

[9] The ALJ apparently assumed that Dr. Fang was a male. In fact, Dr. Xiao Fang is a female. http://www.healthgrades.com/physician/dr-xiao-fang-xdjpf

In reviewing the medical evidence with respect to plaintiff's ability to sit for prolonged periods, the ALJ noted that she did not, on examination by Dr. Fang, have any muscle spasms which would hinder sitting. (T. 31). While the ALJ is correct that she observed no muscle spasms in connection with the February 17, 2012 examination of plaintiff, Dr. Fang also noted that plaintiff complained of low back pain, "especially after sitting, standing more than 20-30 min[utes]." (T. 462). Dr. Fang observed that plaintiff ambulated with a slow gait, had decreased range of motion of her lumbar spine, and displayed tenderness in the lumbar paraspinals. (T. 463).[10] As discussed above, Dr. Fang made similar observations during her June 27, 2011 examination of plaintiff, and noted, at that time, "[patient] states that she is in a lot of pain[;] sitting for long periods of time is the worst." (T. 441-42). To the extent that the ALJ suggested that the totality of Dr. Fang's medical findings regarding plaintiff undercut her explicit opinion, in two different RFC questionnaires, that plaintiff could only sit for a total of four hours in an eight-hour workday (T. 438, 486), the ALJ improperly substituted his opinion for that of a medical expert. *See Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010) (an ALJ may choose among properly submitted medical opinions, but may not set his own expertise against that of physicians who submitted opinions to him) (citing *Balsamo v. Chater*, 142 F.3d 75, 80-81 (2d Cir. 1998) (in the absence of a supporting medical opinion, the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion). And, as discussed

_____

[10] As discussed in note 8, above, Dr. Fang did observe lumbar muscle spasms during her September 10, 2012 examination of the plaintiff, although that occurred after the ALJ's decision (but before the Appeals Council decision).

further below, the other medical evidence did not provide substantial evidence to support the ALJ's conclusion that plaintiff could, even with periodic adjustments in position, meet the requirements of sedentary work by being able to sit for six hours in an eight-hour workday.

The ALJ also erred by failing to account for Dr. Fang's opinions that plaintiff had other substantial limitations that were inconsistent with his the ALJ's determination that plaintiff's symptoms would "frequently" interfere with her attention and concentration required to perform simple work-related tasks; that she would need a job permitting shifting positions "at will" from sitting, standing, or walking; that she would need to recline or lie down during an eight-hour workday in excess of the typical 30 to 60 minutes for lunch and two 15-minute breaks, in the morning and afternoon; that she would need unscheduled five-minute breaks every hour during an eight-hour workday; and that she would miss work more than four times a month as a result of her impairments or treatments. (T 486-87).[11] The ALJ cannot "cherry pick" only the evidence from medical sources that support a particular conclusion and ignore the contrary evidence. *See, e.g., Royal v. Astrue*, No. 5:11-CV-456 (GTS/ESH), 2012 WL 5449610, at *6 (N.D.N.Y. Oct. 2, 2012) (while ALJs are entitled to resolve conflicts in the record, they cannot pick and choose only evidence

---

[11] Dr. Fang's February 17, 2012 RFC questionnaire answered "yes" to the question of whether plaintiff could work an eight-hour day, five days a week, on a sustained basis. (T. 31, 487). As reflected, in the definition of sedentary work set forth above, and the testimony of the vocational expert, discussed below, Dr. Fang clearly found that plaintiff had limitations that precluded her from performing sedentary work on a sustained basis. The fact that this pain specialist lacked the knowledge of a VE as to what physical limitations were inconsistent with sustained sedentary work does not undermine the opinions about the plaintiff's particular limitations, which, as the ALJ recognized, Dr. Fang was well-qualified to provide.

from the same sources that supports a particular conclusion) (citing, *inter alia*, *Fiorello v. Heckler*, 725 F.2d 174, 175-76 (2d Cir. 1983)) (Rep't-Rec.), *adopted*, 2012 WL 5438945 (N.D.N.Y. Nov. 7, 2012). Moreover, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7.

In arriving at his RFC determination, the ALJ noted that, during a March 2012 emergency room visit for back pain and numbness in her lower extremities, plaintiff did not present with muscle spasms and that her symptoms improved with medication.[12] (T. 30, 31, 467-69). While the ALJ noted that plaintiff had positive straight leg raises bilaterally, he neglected to mention some of the other observations of the emergency room doctor: that plaintiff had decreased range of motion in her back, pain both at rest and with movement, radiating pain, and tingling in both legs. (T. 30, 467, 468). The ALJ appeared to selectively rely on findings of a doctor who saw plaintiff once for less than two hours, while ignoring considerable contrary medical evidence from other treating sources. *See* 20 C.F.R. §§ 404.1527(c)(2)(I), 416.927(c)(2)(I) ("the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion")

The ALJ also reviewed the medical records of plaintiff's neurosurgeon, Dr. Sethi, noting that, as of June 2011, plaintiff "could sit for 30 to 45 minutes at one

---

[12] As discussed below, the ALJ ignored other evidence regarding the inefficacy of medication in treating plaintiff's symptoms and the serious side effects that she experienced from certain medications.

time." (T. 31). To the extent the ALJ relied on that limited statement for support for his conclusion that plaintiff could satisfy the requirements of sedentary work by sitting for up to six hours in an eight-hour workday, he erred.[13] *See, e.g., Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) ("An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of claimant's work-related capabilities."). During later visits between August 2011 and February 2012, Dr. Sethi and his staff treated plaintiff for worsening, severe, debilitating, radiating pain in her neck, shoulders, and back. (T. 457-60, 465). This pain was reportedly aggravated by, among other things, "prolonged sitting and standing," and was sometimes accompanied with muscle spasms corroborated on examination. (T. 458).

The ALJ opined that Dr. Sethi's medical records reflected that plaintiff's lumbar spinal fusion surgery was generally successful in relieving plaintiff's symptoms, as evidenced by the fact that Dr. Sethi concluded, in February 2012, that he only needed to see plaintiff once per year thereafter. (T. 30, 31). The fact that Dr. Sethi ultimately found no evidence of neural compressive pathology following the spinal fusion surgery he performed does not support the ALJ's conclusion that there were no diagnostic findings that would support limitations on plaintiff's ability to sit for prolonged periods. As discussed above, Dr. Sethi referred plaintiff to other medical specialists to address whether demyelinating disease or fibromyalgia was causing

---

[13] Interestingly, the ALJ rejected the findings of Dr. Sethi with regards to how much weight plaintiff could lift, push, and pull, in favor of the more conservative opinions of Dr. Fang, which the ALJ found "is more supported by the medical findings." (T. 31).

plaintiff's apparent neuropathic pain because he did not see a role for further surgery in addressing her ongoing symptoms.

In addition to pain specialist, Dr. Fang, plaintiff was referred to a rheumatology practice, where she was treated by Nurse Practitioner Null, who also completed an RFC questionnaire in May 2012. The ALJ afforded NP Hull's opinions "little weight except for the portion in which she opines that the claimant can stand and walk for two hours total in an eight-hour workday" because she only saw plaintiff twice in a brief period and because her findings were inconsistent with her own medical findings. (T. 31). Again, the ALJ improperly and selectively relied on only the medical findings of NP Hull that supported the ALJ's RFC determination and failed to explain his failure to accept other conclusions. The ALJ focused on NP Hull's findings regarding plaintiff's abilities to use her upper extremities, and did not address the substantial limitations that the nurse practitioner found, which were more consistent with the findings of Dr. Fang than the ALJ's RFC determination: that plaintiff's symptoms would frequently be severe enough to interfere with the attention and concentration required to perform simple work-related tasks; that she could sit for only 15 minutes at a time and up to one hour in an eight-hour workday; that she would need a job which permitted shifting positions at will from sitting, standing, or walking; that she would need to recline or lie down during an eight-hour workday in excess of the typical 30 to 60 minutes for lunch and two 15-minute breaks in the morning and afternoon; that she would need unscheduled breaks every 20 minutes lasting ten minutes in duration during the eight-hour workday; and that she would

miss work more than four times per month as a result of treatments and impairments. (T. 31-32, 503-04).

The court concludes that the ALJ failed to properly evaluate the medical evidence in connection with his RFC analysis, particularly by selectively relying on the medical findings supporting his RFC determination while ignoring contrary opinions, particularly from Dr. Fang. On remand, the Commissioner should properly address the totality of the medical opinion and other evidence.

## C. Credibility

In making his RFC determination, the ALJ relied on the plaintiff's statements about relief of her symptoms from medication (T. 29), the scope of her daily activities (T. 29, 30, 32), and "reported relief after she changes position" (T. 31), in concluding that she could sit for more than four hours in an eight-hour workday and otherwise perform sedentary work with specified, additional limitations. The court concludes that the ALJ erred in reaching his conclusion that plaintiff's statements about her symptoms and limitations were not credible to the extent inconsistent with his RFC determination (T. 29), because the ALJ unfairly construed some of plaintiff's statements and because he failed to consider certain required factors, particularly the side effects of plaintiff's medications.

During testimony at the administrative hearing, plaintiff acknowledged that her pain medications did help with pain, at least "sometimes." (T. 50, 54). While the ALJ relied on that admission, he failed to discuss the evidence of substantial side effects and limited efficacy of plaintiff's various medications, which were documented, both

in her testimony and prior statements (T. 50, 56, 216-17, 232) and in various medical records (T. 436, 462, 472, 486, 503).  As noted above, the efficacy and side effects of medication are among the factors that an ALJ should consider in making a credibility assessment, and the ALJ erred by failing to do so here.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Plaintiff's testimony (T. 52, 54), her prior statements (T. 212-214, 216, 230), and the medical evidence (T. 436, 441, 458, 462, 486, 503) all indicated that sitting for more than 30 minutes or so at a time caused pain and swelling, which required her to get up and move around.[14]  Based on that evidence, the ALJ cited plaintiff's "reported relief after she changes position" as support for the conclusion that she could sit for more than four hours in an eight-hour workday if she were allowed to change positions every 30 minutes.  (T. 31).  This court concludes that the ALJ's inference about plaintiff's purported ability to sit for a prolonged period is erroneously based on an unfair construction of plaintiff's statements.

With respect to her daily activities, the ALJ's opinion first noted that plaintiff reported that she got her children ready for school, did cooking and dishes occasionally, sometimes needed help dressing, drove short distances, and did shopping for 30 to 45 minutes at one time.  (T. 29).  In summarizing the basis for his conclusion that plaintiff's daily activities suggested that plaintiff had a greater RFC than she claimed, the ALJ stated:  she "can perform her own personal care . . ., [and]

---

[14] Defendant's brief (at 11) relies upon statements by plaintiff that she could sit for one to two hours before becoming uncomfortable (T. 187).  That statement was made by plaintiff in connection with a prior disability application, in September 2010, before she even had her spinal surgery.  (T. 177).

completes her own household . . . cleaning, grocery shopping, and child care." (T.

32). In fact, plaintiff, who lives with a boyfriend and two school-age children (T. 46),

gave testimony in May 2012 regarding her daily activities which suggested a much

more limited capacity than the ALJ described:

> 6:00 a.m. I get up, I get my daughter up . . . [and] get her ready for school. . . . I
> will massage my legs for the first half-hour of every morning. And then I lay
> flat for a half-hour on the floor because it helps with the spine. . . . And then
> after that I will do light housework if I am able to. I sit to do dishes. I sit when
> I cook in dinner. I'm usually in bed by 8:30, 9:00. That's pretty much my day.
> [(T. 50).] . . . I sweep when I can, when my legs aren't shaking too bad. I am
> able to let my dog in and out. . . . I really don't do much of anything else. . . .
> There are days when I need to get help dressing. [(T. 51).] . . . [T]here's days
> where I am burning so bad [with pain] I can't shower. I have to give myself a
> sponge bath. I have days where I can't even get out of bed. My legs are numb,
> my hips are sore, and my back is throbbing. [(T. 53).][15]

The plaintiff also testified that the heaviest thing she can lift without pain is a gallon

of milk. (T. 58). Again, to the extent the ALJ relied on plaintiff's admissions about

her daily activities to question her credibility and to determine her RFC, in particular

her ability to sit for prolonged periods (T. 32), the court concludes that the ALJ did

not fairly characterize plaintiff's statements.

In short, the ALJ erred in assessing plaintiff's statements about her symptoms

and limitations. On remand, the ALJ should more accurately construe plaintiff's

statements and consider the relevant factors in the credibility analysis, including the

side effects of plaintiff's medications.

---

[15] Plaintiff's May 2011 function report provided a similar account of her daily activities.
The report noted that plaintiff had help from her boyfriend taking care of her children and pet.
(T. 208). At that time, plaintiff reported that she cooked fact, easy meals three to four times per
week and did light housework, including laundry and cleaning. (T. 208-10).

## VII. STEP FIVE/VOCATIONAL EXPERT

### A. Legal Standards

At step five of the disability analysis, the burden of proof shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). But if plaintiff has non-exertional impairments, and if those non-exertional impairments "significantly limit the range of work" permitted by his exertional impairments, the ALJ may be required to consult a vocational expert ("VE"). *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986).

If the ALJ does use a VE, he presents the expert with a set of hypothetical facts to determine whether plaintiff retains the capacity to perform any specific job. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981). The ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations. *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009). Where the hypothetical is based on an ALJ's RFC analysis, which is supported by substantial facts, the hypothetical is proper. *Id.* at 276-277. Conversely, a VE's opinion in response to an incomplete hypothetical question cannot provide substantial evidence to support a denial of disability. *See DeLeon v. Sec'y of Health and Human Servs.*, 734 F.2d. 930, 936 (2d Cir. 1984) (finding that, as a result of the ALJ's failure

to present the full extent of the claimant's physical disabilities to a vocational consultant, the record provided no basis for drawing conclusions about whether the claimant's impairments rendered him disabled).

### B.    Analysis

The ALJ's errors in reaching his RFC determination also tainted his analysis at step five of the sequential disability analysis.  As discussed above, the ALJ did not marshal substantial evidence supporting his conclusion that plaintiff could sit for more than four hours during an eight-hour workday.  However, the ALJ's hypothetical questions to the VE assumed that plaintiff could satisfy the standards of sedentary work, including the ability to sit for six hours during the workday, with the additional limitation that she would need to change position every 30 minutes.  (T. 63).

The ALJ asked the VE about an additional limitation that the plaintiff would need to take unscheduled breaks every 60 minutes lasting five minutes, and the VE opined that this restriction would preclude plaintiff from any type of suitable work. (T. 64-65).  The ALJ's conclusion that there were jobs in the national economy that plaintiff could perform (T. 32-34), reflects his failure to take account of this additional limitation.  As noted above, the ALJ erred in failing to explain why he apparently rejected this and other limitations found by Dr. Fang (and Nurse Practitioner Hull).

In short, the ALJ failed, at step five, to pose and rely upon proper hypothetical questions to the VE that reflected an RFC determination that was supported by substantial evidence.  On remand, the ALJ must perform a proper RFC/credibility analysis and formulate proper hypothetical questions reflecting an RFC determination

supported by substantial evidence.

## VIII. <u>NATURE OF REMAND</u>

"When there are gaps in the administrative record or the ALJ has applied an improper legal standard . . . remand to the Secretary for further development of the evidence" is generally appropriate. *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). The plaintiff does not contend, and this court cannot conclude that "substantial evidence on the record as a whole indicates that the [plaintiff] is disabled[,]" and thus, I cannot recommend a remand solely for the determination of benefits. *See Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996).

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED**, that the decision of the Commissioner be **REVERSED** and this case **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for a proper determination of plaintiff's residual functional capacity and other further proceedings, consistent with this Report.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d

15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: May28 , 2014

Hon. Andrew T. Baxter
U.S. Magistrate Judge